Your Honor, this case is under Doctrine 2-14-0964. Christopher Moody, Ronald Kirsten, and Shirley Kirsten, plaintiffs at Kalamazoo, v. David A. Freeland, D.C., et al., defendants at the felonies. Arguing on behalf of the plaintiffs at Kalamazoo, Attorney Mr. Benjamin Nicholson. Arguing on behalf of the defendants at Kelly, North Chicago, Iowa traffic, and Dr. Freeland, Attorney Mr. Terrence J. Madden. Arguing on behalf of the defendants at Kelly, North Chicago, Iowa traffic, and Dr. Freeland, Attorney Mr. Randolph Monroe. Okay, I understand then, Mr. Madden, you're going to take five minutes? Yes. And then Mr. Monroe, ten. Yes. Okay, thank you. Mr. Nicholas, it's your turn. May it please the court, counsel. My name is Benjamin Nichols and I have the honor today of appearing before this court on behalf of the appellants, Christopher Willie and his parents, Ronald and Shirley. The trial court in this case erred in granting summary judgment on proximate cause grounds because this required the court to weigh conflicting testimony regarding proximate cause and to construe that testimony against Christopher Willie, the non-movement for summary judgment. And let's just, for purposes of this record, line up who were the conflicting witnesses. Absolutely. So the plaintiffs presented Dr. Bernstein as the primary proximate cause witness and Dr. Bernstein provided testimony that the surgery was not inevitable and that it was the October 24th chiropractic treatment that's the subject of the litigation that proximately resulted in the need for surgery. The defendants themselves, along with their experts, presented evidence to the contrary. At the heart of the proximate cause issue is Dr. Bernstein's opinion on page 850 of the record that if Christopher Willie had been properly treated with a neck collar, he more likely than not would not have needed to undergo the posterior cervical fusion surgery and that the injury would have healed through conservative treatment in the cervical collar had it not been for the October 24th chiropractic treatment. At the end of the day, given that opinion and the precedent from the Supreme Court that was binding upon the trial court to construe that evidence in favor of Christopher Willie, there isn't really a need to further discuss the proximate cause issue. How does that opinion square with his testimony at pages 53 through 55 of his deposition where we talk about the ligament injury and when it occurred and whether that would require surgery? That seemed to be the trial courts. I mean, if we're only talking about this facet fracture moving and that's all we have, that's the only injury that was ever found, we probably wouldn't be here today. You would have tried this case at some point in the past. But the question is about this ligament, is it not? Sure. So it's clear that the ligamentous injury was of primary importance to the trial court when the trial court made the ruling. So first off, any issues about the ligament notwithstanding, with the trial court having the obligation to construe the opinions in favor of Christopher Willie, I submit first and foremost that none of the ligamentous injuries matter because as long as you have the opinion that I have just read, that creates an issue of fact. However, we don't need to rely on that. And this particular argument that you're making to us now, as I recall it, is sort of the argument that confused the trial court that you made and got you into a bit of a pickle with the trial court. Sure. So in terms of the ligamentous injury itself, though, first off, there's conflicting information creating a question of fact about when the ligamentous injury occurred. And interestingly, both sides have presented evidence that admittedly is contrary to their own interests. So Dr. Bernstein did present evidence, as Justice Burke mentioned, that the ligamentous injury was likely present on October 24th. Dr. Freeland, to the contrary, gave testimony that the injury was not present on the 24th when he manipulated Christopher Willie. So already there's a question of fact about when this injury or when this ligamentous injury was present. Dr. Bernstein, sorry, Dr. Freeland specifically testified to a reasonable degree of medical certainty the ligamentous injury was not present on the 24th. The trial court was clearly focusing on the notion that if there is a ligamentous injury, surgery was inevitable. So as long as, one, we have conflicting opinions about whether a ligamentous injury was present on October 24th when the negligent treatment occurred, then that eliminates the reasoning that the trial court used that surgery was inevitable as of October 24th because we have a question of fact about whether a ligamentous injury was present at that time. But Dr. Bernstein went on to testify about this injury and about the ligamentous injury and its need for surgery. First off, he described when treatment, when doctors are faced with somebody with a history like Christopher Willie and they have to decide, do we give him surgery or do we put him in a collar? They have to consider several factors. Dr. Bernstein explained on page 851 of the record that these injuries should be treated surgically when there is flexion extension instability and when you have ligamentous damage that's significant that it would be demonstrated on an MRI or when you have radiculopathy. Did he have radiculopathy? Not until the October 24th treatment. So he did not have radiculopathy until the moment that the defendant chiropractor manipulated his neck and at that moment, as the testimony is clear, he had searing pain. He had pain shooting down his arm and this changed his clinical presentation significantly. This was the beginning of his radiculopathy and that's what set the need for surgery into motion. Dr. Bernstein went on to testify specifically about the radiculopathy issue and he testified, let me just find it here, he testified that the need for surgery was caused by the radiculopathy as opposed to anything else. Now that's obviously in conflict with what the appellees state. They state that the football injury caused the need for surgery and that's of course what the trial court believed as well but as long as there's conflicting testimony about that, it's again a question of fact. Even if the football injury caused the tear, isn't it the position of the plaintiff that the adjustment caused the bone fragment to move and impinge upon the nerve root and isn't that what Dr. Bernstein said? That is correct, Your Honor, and Dr. Bernstein believes that the impingement on the nerve root was the source of the radiculopathy and that's what caused the need for surgery. It's the treatment on October 24th. Now Dr. Bernstein was anything but stellar at that deposition, if I must say so myself. Do you think perhaps that searing cross-examination or direct, that adverse witness is something that may have caused the trial court to be a little bit confused? The record is certainly difficult to wade through. But be that as it may, the trial court has an obligation under Gatlin v. Rutter to take all of those opportunities where there's conflicting evidence and there are so many in this case and to construe them in favor of Christopher Willey and it's our position that that's not what happened. So here we have conflicting evidence about when the ligamentous injury occurred, whether it was present on the 24th or not. We have conflicting evidence about what the cause of the surgery was, whether it was radiculopathy or the ligamentous injury. And we have conflicting evidence about whether Christopher Willey would have recovered without surgery. Doesn't some of that conflicting evidence, though, come on your side, so to speak, because Dr. Andrushak then, if I'm saying his name right, kind of weighs in with yet more information? Sure, Dr. Andrushak weighs in. Two points about Dr. Andrushak. First off, Dr. Andrushak, I think at the heart of his testimony, he has an opinion that he gave that the injury that he found at the time of the surgery resulted from the football game. Of course, Dr. Andrushak did not have the benefit of having seen all of the evidence in this case. Dr. Andrushak did not have the benefit of reading deposition testimony or knowing about the chiropractic treatment, really. The plaintiff never told him that he was manipulated, and that's when the— I believe that's the case, Your Honor. And the person in this case who did have the benefit of reviewing all of that evidence is Dr. Bernstein. And so long as Dr. Bernstein gives the opinion that the surgery— or that Christopher Willey would have recovered without surgery, then that really, in terms of proximate cause, if not trumps Dr. Andrushak, at least creates a question of fact that is enough to send this matter to the jury. Did Dr. Andrushak ever change or modify his original— obviously this came probably from an original report— once he learned of the other issues that had occurred, or was he never asked about that? He wasn't really asked about it. Dr. Andrushak wasn't ever presented with the chiropractic records. Dr. Andrushak did not perform any in-depth study of what happened to Christopher Willey at the chiropractic treatment. And frankly, we see that all the time. I mean, treating physicians, surgeons are much more interested generally, as a general assumption, of how to treat the injury than trying to determine from a legal point of view what the actual origin of the injury was. Because they didn't want to have to come to court. I drew a good blade in them. So, Your Honors, there is a question here. Pardon me. While you're looking for that. You say one of the issues, or one of the questions of fact, is the conflicting evidence of whether the ligamentous injury was present on 1024. In the trial court, the trial court said, But the ligamentous injury occurred during the football game, not as a result of manipulation. And you responded, So, I mean, is that some type of admission that should be held against your client, that the ligamentous injury was present from the football game on 1024? I don't believe so, Your Honor. So, here we have, first off, we have three temporal events that show the presence, or that describe when, if at all, the ligamentous injury was present. We have the 1024, or the evaluations in that week, by Dr. Freeland. Where Dr. Freeland had his hands on Christopher Willey, x-rayed Christopher Willey, tested him, and gave an opinion that there wasn't a ligamentous injury then. Then, skipping forward, we have an MRI, which is the very best test to show whether there's a ligamentous injury. And I think it's uncontroverted. It doesn't show one there. So, up until that point, we really have a large question as to whether there was a ligamentous injury, and to what extent, if there was one, it existed. Then we skip forward to the surgery with Dr. Andrushak, and all of a sudden we have testimony that there was one at that time, because he could see it during the surgery. But the trial court laid that issue to rest as to the ligamentous injury being caused by the manipulation. And that's how they reached the conclusion in summary judgment that they did, saying that it wasn't caused by the manipulation, therefore, summary judgment. Well, and I think that there are two problems with that philosophy. One is it implies that if the injury wasn't caused by the manipulation, it must have been by the football game, as opposed to any other thing in the whole world that could have happened, and we don't know. But two, again, it goes back to this whole issue, which is, I think, an incorrect approach for the trial court to have used, which is the assumption that any ligamentous injury required surgery. That's not what the evidence shows. That's certainly what some of the evidence the defense has presented shows, but Dr. Bernstein is clear about two things. One, ligamentous injuries that are so severe that they show up on an MRI require surgery, which this one was not, and that he could have been treated conservatively with a collar and recovered. So this whole philosophy that the trial court used, that any ligamentous injury must require surgery, is questioned by the evidence. And any time that there's this question of fact, it needs to be resolved in favor of Christopher Willey. Did Dr. Anderson say that the ligament was torn? Yes, he did, Your Honor. And the MRI that he took, that he relied on before surgery, did not show the injury? That's correct. And didn't Dr. Bernstein say that if a ligament is torn, it has to be repaired surgically? Well, not exactly. Dr. Bernstein said that if you know of a torn ligament, so two things. One, if you know of a torn ligament before surgery, obviously you can't see into the person's neck to do surgery until you decide to do it. So before that ever happens, there's this crossroad where the doctor has to say, do we put him in a collar or do we prescribe surgery? And the only information available to the doctors at that time is what's available from a clinical examination, which didn't show a ligamentous tear, or what's available from an MRI, which didn't show a ligamentous injury. So based on the information that the doctors had available to them when they made this decision,  the reason why surgery was prescribed was because of the radicular pain, and that only happened because of the October 24th manipulation. So using the facts available, and I think that that's the appropriate way to look at it. In a malpractice case, normally you have to prove the standard of care that was available at the time of the treatment. Here we're looking at the information available at the time of the decision. And so on November 14, when Andrzak saw the plaintiff, the X-ray and the MRI at that time showed no fractures, showed nothing on the tear. An X-ray, I believe, would show a bone fracture. I don't remember whether it was found at that point in time, but there was certainly clinical suspicion of a bone fracture beforehand. But the MRI did not. Can you extrapolate from this testimony the totality of it, that your client would have had to have surgery for this ligament tear at some point in time in the future no matter what? No, Your Honor. Dr. Bernstein testified on page 853 of the record that the cervical MRI scan doesn't show any ligamentous injury. So if somebody argues this patient was going to need surgery because they had severe ligamentous instability, I'd say there's not evidence of that on the MRI scan. And, of course, he follows up by saying that Christopher Lilly could have been treated with a cervical problem. After the manipulation on October 24, did Dr. Friedland see Christopher again, or did he then go to? That was the end of his treatment of Christopher Lilly. All right. And one other question. He played football on October 19. Was there an MRI after October 19, or just the hands-on manipulation? All of the MRI happened. The only MRI information we have is all after October 19. We don't have one from before that. See, my time is up. Thank you so much, Your Honors. You'll have an opportunity. Yes. Thank you. Mr. Mann, you want to go first? Yes. So you're representing West Chicago Chiropractic and Dr. Friedland? Correct. Okay. Thank you, sir. First of all, let's dispense with this issue as to when the ligamentous injury took place because the plant's own expert, Dr. Bernstein, their own operating surgeon, both agreed that the fracture occurred at the time of football injury and that the ligamentous injury also occurred at the same time. Does your client disagree with that? No. Because your client testified that on 10-24 there was no ligament instability, no sign of a ligamentous injury, and, in fact, the manipulation would have been contraindicated, correct, if that would have been the case? If? If there would have been instability and a ligamentous injury that was apparent. Perhaps. Okay. I'm not sure that that's established in the record. But both Dr. Andruschak and Dr. Bernstein admitted that at the time of the initial football accident, the subfraction took place and the ligamentous injury took place. So then wouldn't that have been against the standard of care to manipulate him, had they known that? If he had known that, perhaps, but nobody did know that because it was found during Dr. Andruschak's surgery where he visually observed the ligament being damaged, torn in half. But it's according to other testimony that it's capable of being observed from an MRI. Why didn't it show up? Well, they said Dr. Andruschak testified frequently these things show up on MRI, but not always. They just don't always show up on MRIs. And Andruschak can't tell the age of that tear. He just knows there's a tear. And he opined that, in his opinion, it took place at the time of the initial injury. Now, the significance of that, of course, is that both Dr. Andruschak and Dr. Bernstein agreed that that torn ligament is not going to heal. The torn ligament will not heal with conservative care. The subfracture might heal with conservative treatment. But the ligamentous injury is simply not going to heal except by surgery. Now, the plaintiff doesn't have to show that the doctor's malpractice, if you will, is the sole cause but only contributed, correct? That's true. So in this case, you can argue where or when this ligament injury occurred. Regardless of that, the plaintiff's position, and I believe Dr. Bernstein's opinion is that the radiculopathy did not occur until the manipulation. It was after the manipulation that the bone fracture had come loose, sat on the nerve root and caused the problems that the plaintiff was having. Isn't that a question for the trier of fact regardless of the stellar cross-examination or questioning at the deposition? Because I believe it was after the plaintiff's lawyer spoke to his client again or questioned Mr. Bernstein, he kind of went back the other way. So how is it that the trial court can come up with summary judgment? Don't we have an issue for the trier of fact? Let me remind the court that at this point. I'm sorry for such a long question. At this point, the plaintiff abandoned the claim that the temporary complaints of increased pain following the adjustment, they abandoned that claim. How so? In order to get the case to this court. Because as long as that claim remained, they did not have an appealable order. So in order to make this appealable, they voluntarily dropped that case, that claim. So that's not part of the case anymore. They dropped the case against. . . No, they dropped the claim. . . Claims against. . . They had to drop that in order to make the case appealable. Otherwise, you would have had a trial on that particular claim. But wouldn't that be part of the evidence that would ultimately be presented and was discussed? It won't be presented anymore because they dismissed it with prejudice. So they abandoned that claim. We have an opinion from Dr. Bernstein at the beginning of his deposition that talks about conservative treatment would have been appropriate but for the manipulation. Then we have this testimony about the ligament, you know, at 853, and we're around that part of the deposition. Page 53, I should say. But then later when plaintiff's counsel is questioning Dr. Bernstein, he goes right back to that same opinion, does he not? He goes back to. . . Initially, Dr. Bernstein gave an opinion without taking into account the ligamentous injury, just dealing with the subfraction. He said if that was an injury, conservative care would have been appropriate. But he wasn't considering the significance of the ligamentous injury at that time because as soon as he was asked whether conservative treatment had worked with the ligamentous injury, he said no. The ligamentous injury would not heal with conservative care. Well, then please tell me why, after he's asked that series of questions, he comes right back to that same opinion that conservative care would have been fine. Because he's, again, being focused upon the subfraction. But he never abandoned his opinion that the ligamentous injury is not going to be treated successively with surgery. He didn't say that conservative treatment of a collar and rest would heal that? Pardon? Did he not state that a collar and conservative treatment of rest would heal that? Oh, the subfraction, yes. But he specifically testified that conservative treatment would not treat the ligament injury. Does it make any sense that a person with a torn ligament in their neck that ends up with this radiculopathy, that ends up having to have surgery, that that individual or that type of an injury would not show up on an MRI, that type of injury would not result in radiculopathy immediately, and would allow an individual to actually play a full contact football game at quarterback one week after receiving a torn ligament in your neck? I mean, is that possible? Certainly. Certainly it's possible. But that's not a question of fact. You're saying it's cut and dried when that ligamentous injury occurred? According to the testimony of their expert, it is. Well, what about the testimony of your client, though? Again, counsel points out that your client said there was no instability, there was no indication of a ligamentous injury, that, in fact, I believe your client may have even said, if I'm not mistaken, that there's no way with a ligament injury he could have played football the next week. My client said, after lengthy questioning, that he couldn't form an opinion as to exactly when instability took place. So isn't that a question for the charge of fact? Not given the testimony of their expert and their treating surgeon. Dr. Bernstein and Dr. Andersack both agreed that he needed surgery but disagreed as to the reason why he needed the surgery. Isn't that true? True. So isn't that a question for the charge? Well, neither one of them would have testified that they needed that surgery without the ligamentous injury. They both agreed that with the ligamentous injury, surgery was the only way to go. I think your time is up. Okay. Mr. Munroe. Good morning, sir. Good morning. May it please the court, counsel, I represent Dr. John Aikenhead. My name is Randall Munroe. Dr. Aikenhead is a chiropractor who specializes in the field of radiology. There are two levels of proximate cause issues with respect to Dr. Aikenhead. The first is the same issue that involves Dr. Friedland, that is, whether the treatment that included chiropractic adjustment to the neck on October 24, 2007, caused the need for surgery. The second issue is whether Dr. Aikenhead's discussion with Dr. Friedland on the first day of treatment, October 17, 2007, contributed to Dr. Friedland performing the adjustment a week later, and thereby was approximate cause of the need for surgery. I want to say just a couple of things about the initial issue, because Mr. Madden has covered it on behalf of Dr. Friedland. First of all, Dr. Andreejak's testimony was clear, and it appears at pages 16 to 18 in his deposition, that his determination that this patient needed surgery was not based upon any radiculopathy. It was based upon the findings on the MRI and the CT scans and his clinical evaluation of the patient that demonstrated an instability. And he said in his deposition, because of this instability, surgery was required. But he didn't see the ligamentous injury, did he? He did not, and as Mr. Madden pointed out, not all ligamentous injuries show up on an MRI. How could the MRI show an instability? Because there was a dislocation of the C5 and C6 vertebrae, and that demonstrated instability. There was also a fracture of the facet joint, one of the stabilizing joints within the cervical spine. But the instability or that displacement doesn't necessarily indicate surgery is required, does it? In Dr. Andreejak's opinion, it did. He said the basis for him determining this patient required surgery was an instability demonstrated by the MRI, CT scan, and his clinical evaluation. Now, one thing to keep in mind. But do we know what caused the instability? Well, we know from, well, in Dr. Andreejak's opinion, and I believe in Dr. Bernstein's opinion at pages 55 and 56 of his deposition transcript, both of those physicians say there was a ligamentous tear as shown on the, at surgery, as demonstrated at surgery. And both say that that ligamentous tear likely occurred during the initial injury of the football game on October 12 before it came under Dr. Freeland's care. Is that what caused the instability, the ligament tear? Well, it was a combination of the ligament tear, I believe, and the fractured facet, which serves a stabilizing purpose in the cervical spine. Didn't Dr. Freeland testify, as I indicated before, that there was no instability present on 1024? Dr. Bernstein. No, Dr. Freeland. Oh, I'm sorry. Dr. Freeland. He may have. And remember, at the time, Dr. Freeland only has an X-ray that doesn't show the soft tissues of the neck like ligaments, and also doesn't rarely, according to Dr. Andreejak, rarely shows a facet fracture. So all Dr. Freeland had was an X-ray that showed the vertebrae were out of place, which can be due to spasm, and his clinical evaluation of the patient, which showed that the patient was getting better over the course of the week he was treating him. The pain symptoms were resolving. And it's at that point, a week later, October 24, that he adds the adjustment to his treatment regimen. Right, but part of the breach of the standard of care that's discussed is that all he had was an X-ray. He should have referred the plaintiff to an orthopedic surgeon. He should have done CTs, MRIs, and things of that nature. That may be with respect to the standard of care issue relating to Dr. Freeland. The trial court's summary judgment, though, was based on the proximate cause issue, that irrespective of what Dr. Freeland did in his treatment, the need for surgery, which is the only remaining claim in this case, occurred as a result of the football injury before he came under Dr. Freeland's care. Well, and getting to the second part of that, you represent Dr. Aikenhead. Why isn't there a second layer of problem? The second layer of problem is whether Dr. Freeland, in fact, relied on Dr. Aikenhead as the only basis for adjusting the patient. And I think there's testimony, both by Dr. Aikenhead and Dr. Freeland, that what Dr. Freeland was told was that any further treatment of the patient should be determined after a reevaluation of the patient clinically. And, in fact, the course of treatment that took place thereafter by Dr. Freeland reflects that, because the initial discussion with Dr. Aikenhead occurred the first day of treatment. There were five treatments thereafter, and on the fifth treatment, a week later, is when Dr. Freeland determined that he could then perform a chiropractic adjustment on the patient, in addition to the other treatment he was providing to him. But didn't Aikenhead testify that he wasn't sure whether he for certain told Dr. Freeland to conduct further evaluation, that that was his practice? That was his custom and practice, and because he has no recollection of this brief discussion he had, which was, by the way, informal, because he was called and asked to stop by the office, look at the films, and talk with the doctors. He didn't prepare a formal report. He didn't charge for this service. It was an informal consultation. He had no recollection of it, so the only evidence we have is his custom and practice. That he would correlate clinically. I'm sorry? That he would tell him to correlate clinically. Yes, yes. And Dr. Freeland agreed with that statement, and also that's what his treatment reflects, because he didn't adjust the patient the next day or the next four treatments or five treatments. On the sixth treatment is when he added adjustment to the regimen. One other point about Dr. Aikenhead's position, the injury that caused the instability, according to Dr. Andrijac, occurred prior to this discussion, prior to Dr. Aikenhead's involvement in the care. So that's another basis that crossed my mind. I thought that there was really no way to tell the age or the, well, the age of that particular injury just by looking at it. There wasn't. In fact, the extent of the injury didn't show up on a plain x-ray. The testimony and evidence we have regarding the age of the injury comes from Dr. Andrijac and Dr. Bernstein, who say that the injury occurred with a football injury back on October 12th. One thing I want to point out, the Seif versus Ingalls Memorial case. I was just going to ask you about the Seif case. You cite the Seif case on page 17 in your brief. You don't give any pinpoint site. You don't have any description of how this supports your case. Should we find that that argument is forfeited since you aren't enlightening us in your brief? I indicate the reason that I'm citing it, and it's really a discussion by the court about why the plaintiff's hired expert in that case couldn't be allowed to say what another doctor who was actually involved in the treatment, what he thought and what he would have done. And I think, and that quote is really the only purpose of the Seif citation, but it fits squarely within this case because Dr. Bernstein is saying there may have been, there was a ligamentous injury. We know that from the surgery. There may have been instability, but I, if I was treating this patient without clear evidence of a ligamentous injury, which we now know was there, I would have treated the patient differently. I would have put him in a collar. He may have healed, but he concedes in his deposition that a ligamentous injury will not heal with conservative treatment alone. It requires surgical repair, and fusion is the treatment, and that's exactly what Dr. Andreejak did in this case. And that's what Dr. Andreejak decided to do based upon the CT and MRI studies and upon the clinical evaluation that he did. Are those contradictory opinions? Does Dr. Bernstein come up with, in essence, diametrically opposed opinions within that deposition? I believe he does. I believe one opinion is based on prospective information that if he saw this patient around the time of the injury or the Dr. Friedland's treatment with the evidence that was available, in his opinion, the patient could have been treated conservatively. Dr. Andreejak, based on similar evidence, the imaging studies and his clinical evaluation, determined that surgery was necessary. So they are conflicting studies, but essentially Dr. Bernstein is saying what he thinks Dr. Andreejak could have done in this case. By the way, Dr. Bernstein does not criticize anything that Dr. Andreejak did. He said that in his deposition. No, because he presented with radiculopathy at the time, and Dr. Bernstein said he would have conducted surgery if he presented with radiculopathy. So, I mean, when he presented to Dr. Andreejak, Dr. Bernstein would have done the exact same thing. It was to the point where he had that surgery. But in his deposition, Dr. Andreejak does not identify radiculopathy as the reason he did surgery. He identified instability. But what caused the instability? I'm sorry? What caused the instability? Well, we now know from the surgery a ligamentous tear was present and also the fracture of the facet, one of the stabilizing joints in the spine. If a doctor within his or her deposition comes up with diametrically opposed positions, how is that not a question of material fact for the jury to determine? Which opinion are we talking about here? Well, the opinions of Dr. Bernstein are contradictory within his own deposition. What he does agree that ligamentous tear requires surgery, and we know a ligamentous tear was present. He agrees that the injury occurred during the football game. Dr. Andreejak says that surgery was required based on his evaluation. Dr. Bernstein's opinion that Dr. Andreejak could have treated this patient differently, conservatively, even though he concedes with the tear, it wouldn't have solved the problem. So that's kind of what we're left with with Dr. Bernstein's testimony. Thank you. Thank you. Thank you. Mr. Nick. Talk about what your opponent talks about that you forfeited or you have foreclosed the opportunity to argue any further, those issues that you dismissed with prejudice. Yes, Your Honor. After the trial court's ruling regarding proximate cause, the trial court left open the issue of whether there was a period of – it left open an issue of damages, whether there was a period of increased pain between the October 24th treatment and the time that the surgery occurred. So this would have been whatever pain and suffering Christopher Willie experienced in those short period of days. Rather than trying the case on that issue of damages alone, the plaintiff opted to waive that particular issue of damages, which made the court's opinion final and which allowed us to then appeal this before this honorable court. Does that preclude you from arguing the radiculopathy based upon the movement of the fracture, the bone fracture, and impinging on the nerve root? No, Your Honor. All that we've waived is the opportunity to seek monetary damages for a period of increased pain and suffering. At no point in time have we waived in any – I don't believe it could be strewed from any documents that have been provided in this court that we're waiving an argument with respect to radiculopathy. What we cannot do is ask for money for the ibuprofen that he took during that time or the cold packs that he used. Well, at a minimum, in order to get from Dr. Friedland to Dr. Andruschek, there has to be some reason, and that would be part of the history that would be considered by a trial effect, correct? Yes, it would be, Your Honor. But we will not be asking for the damages for that. Rather, the proximate cause issue still remains. Dr. Bernstein has testified that the surgery was necessitated by the radicular pain that started as of the October 24th manipulation. We will bring that to the trial effect if given the opportunity. Your Honor, I would like to talk about the issue that opposing counsel raised, saying that Dr. Bernstein abandoned his opinion regarding the ability to recover from a ligamentous injury. That is not the case. At the end of his deposition, as Justice Berg pointed out, Dr. Bernstein again reaffirmed his opinion that Christopher Willie could have been treated conservatively and would have made a good recovery. Dr. Bernstein did testify regarding this issue about whether the ligamentous injury heals or not. And he testified on page 852 of the record that if Christopher Willie had not had surgery, the subluxation would have continued. Subluxation, and he's really talking about the ligamentous injury here, would have continued throughout the rest of his life, but it would not be worrisome. It's really about the integrity of the cervical spine and the strength of the segment. So whether or not he had this injury… Are we really talking about the same thing when we're talking about subluxation and the ligamentous tear? Well, they're intricately related here. And what we can say is that Dr. Bernstein, after having reviewed all the information in the case, and after having been brought after in his cross-examination, all of the issues that we've talked about here today were brought to his attention and hashed out in great detail, he still went back to his opinion that Christopher Willie would have recovered were it not for the October 24th treatment and a cervical collar would have been good enough. In the surgery that Dr. Andersheim did, it's worth pointing out, he did nothing to repair the ligamentous injury. He stabilized the joint. That's what the fusion surgery does. Christopher Willie still has an injury to his ligament. It's just not affecting him. And Dr. Bernstein stated that it's really a matter of severity. When he talked about the factors that doctors must use in deciding whether to do a surgery, one of the things they use is whether a ligamentous injury is so severe that it shows up on an MRI. The implication there is that minor ligamentous injuries are something you can live with as long as the joint is otherwise stable, as long as surgery isn't otherwise indicated. And that's the position that we have here, Your Honor. One quick issue. Dr. Bernstein, I think it was a question by you asking him if it was necessary to remove that fragment fracture to decompress the C6 nerve root. And he said it would have been an option. You wouldn't necessarily have to remove that fragment because you were going to get the resorption of that fragment. It's not going to be a long-term problem. Does that go to, again, if the need for the surgery was because of the manipulation and the subluxation as a result of the manipulation, but if you didn't have to remove the bone fracture, why wouldn't you have to have the surgery as a result of the tear anyway? I don't know if I'm asking that question right. But, I mean, I think I'm reading your issue is that the surgery is as a result of manipulation, which was predominantly because of that fracture. Okay. So if the bone fragment would not necessarily have had to have been removed, why is it the manipulation that caused the surgery when, in fact, the surgery was caused by the tear? Well, two points, Your Honor. First off, at the time that the decision to perform surgery was made, no one knew there was a tear. So it's difficult to suggest that the surgery was caused by the tear because no one at any point in time knew of the tear until the surgery happened. So thank God they went in there and did the surgery, right? Well, but after all of the evidence came in and after Dr. Bernstein saw all the reports and saw the MRI and saw the operative report, Dr. Bernstein said he would have recovered with conservative treatment because, ostensibly here, because any tear that was found was minor enough that it didn't show up on MRI. And so any doctor making the decision, as long as there wasn't radiculopathy present, the doctor would have chosen a conservative treatment. It's the radiculopathy that started on October 24th that pushed Christopher Lilly into the candidacy for surgery. So what exactly did the surgery do if it didn't repair the ligamentous tear and didn't, well, did it, well let me ask, did it move that facet fracture? Your Honor, the surgery was a fusion surgery, so it stabilized his spine. It kept his spine from moving while everything healed. A cervical collar also would have stabilized his spine and kept it from moving. There are two wells. Would it have reduced the impact of that facet fracture that had now moved onto that nerve root? The facet fracture moved onto the nerve root and in the surgery it was removed. It was. With conservative treatment it would have disappeared on its own. The body would have resorbed it and the radiculopathy would have been stopped. But instead you have a child here with shooting pain down his arm. And rather than putting him in a cervical collar and letting the body resorb the bone over a slow period of time, the issue was addressed surgically. There would not have been a need to address that pain surgically had it not been for the October 24th treatment that caused the pain. Is there any concern about the October 19th game where he played almost the entire game? Does anybody care about that? That's after the first injury? It hasn't really been addressed in the briefs. It hasn't really been addressed in the opinions. And ultimately whatever the injury Christopher Willie had, the question that is on all of our minds is what treatment was appropriate on October 24th when he was seen by Dr. Freeland. Thank you very much. Thank you for your time. Gentlemen, thank you for your time. We really appreciate your intelligent argument. You give us something to think about and we will take this case under consideration and render a decision in due course. The court is adjourned for the day. Thank you very much. Safe travels back.